## LACLEDE-CHRISTY CLAY PRODUCTS COMPANY v. CITY OF ST. LOUIS et al., Appellants.

### Division Two, December 10, 1912.

1. **PUBLIC ROAD: Evidence Necessary to Establish Existence.** In 1862, an order of the county court of St. Louis county attempted to establish a public road called Sulphur avenue. The order was void, but in 1866 a member of the plaintiff corporation signed a communication to the court recognizing the existence of a road there, and his testimony shows that in 1863 there was a road with good fences on either side. In 1875 the plaintiff was one of forty-six petitioners asking the county court to grade said road, which in 1876 was taken into the city of St. Louis; in 1882 said plaintiff acquired land bordering the highway by deeds which stated they were subject to it, and in 1889 the plaintiff, its charter expiring, made to itself as a new corporation a deed showing the existence of the highway. The city, in 1889, replaced a bridge on said highway. *Held*, in this suit to enjoin the removal by the city of plaintiff's structures from the right of way, that the land in question was a public highway.

2. ———: **User for Ten Years.** The use of a road for ten years with the acquiescence of the owner makes it a valid road.

3. ———: **Title Vesting in City.** By virtue of Sec. 10, Art. 1, of the Scheme and Charter of St. Louis (1876), the interest of St. Louis county in all public roads and highways taken into the city was vested in said city. *Semble*, that independent of such provision such would be the result of taking a public road into a city.

4. ———: **City Streets: Sec. 10446, R. S. 1909.** Although in this case it is not clear there was such nonuser, it is *held* that Sec. 10446, R. S. 1909, providing that "nonuser by the public for a period of ten years continuously of any public road shall be deemed an abandonment," does not apply to city streets.

Clay Products Co. v. St. Louis.

5. **CITIES: Streets: Title not Lost by Abandonment or Adverse Possession.** The right of a city and the public to the use of a street cannot be lost by abandonment or adverse possession.

6. ———: ———: **Title: Estoppel.** A city is not estopped from asserting title in a street by the declaration of its street commissioner that the ground in question was not a street, nor by its ordinance condemning the right of way for the purpose of laying sewer and water pipes.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale*, Judge.

REVERSED AND REMANDED (*with directions*).

*Lambert E. Walther* and *Truman P. Young* for appellant.

(1) Sec. 9472, R. S. 1899, does not apply to streets in the city of St. Louis. R. S. 1879, Sec. 6987; Laws 1883, p. 170, Sec. 58; Laws 1887, p. 257, Sec. 57; R. S. 1889, Sec. 7847, State v. Muir, 138 Mo. App. 118; State v. Tramsue, 131 Mo. App. 323; State v. Craig, 79 Mo. App. 412; State v. Macy, 72 Mo. App. 427; State v. Pullen, 43 Mo. App. 620; Harper v. Morse, 46 Mo. App. 470; In re Forsyth Boulevard, 127 Mo. 417; Rose v. Kansas City, 128 Mo. 135; In re Essex Avenue, 121 Mo. 98. (2) The right to vacate streets is given to the city of St. Louis by its charter, and must be exercised by the mayor and assembly acting by ordinance. This method of vacating streets is exclusive of any other method. Manker v. Faulhaber, 94 Mo. 430; Glasgow v. St. Louis, 107 Mo. 98; Knapp-Stout & Co. v. St. Louis, 156 Mo. 343; Christian v. St. Louis, 127 Mo. 109. There is a marked difference between a country road and a city street. Elliott on Roads and Streets (2 Ed.), pp. 15, 16, 19 and 22. The right of the city to maintain title to a street which is not traveled by the public has long been recognized by this court. Downend v. Kansas City, 156 Mo. 60; Meiners v. St. Louis, 130 Mo. 284; Baldwin v. Springfield, 141 Mo. 205; Brinck v. Collier, 56 Mo. 160; Hunter v. Weston,

111 Mo. 176; Ely v. St. Louis, 181 Mo. 723; Atkinson
v. Nevada, 133 Mo. App. 4; Curran v. St. Joseph, 143
Mo. App. 618.   (3)  The Statute of Limitations does
not run against the city's right to the public streets.
R. S. 1899, Sec. 4270; Wright v. Doniphan, 169 Mo.
601; Brown v. Carthage, 128 Mo. 10; St. Louis v. Rail-
road, 114 Mo. 13; Williams v. St. Louis, 120 Mo. 403;
Insurance Co. v. St. Louis, 98 Mo. 422; Glasgow v.
St. Louis, 107 Mo. 198; State v. Culver, 65 Mo. 607;
Commonwealth v. Albarger, 1 Hort. Pa. 487.   (4)  The
city cannot be estopped to assert its title to a public
street.   Moses v. Dock Co., 84 Mo. 242; Buschmann v.
St. Louis, 121 Mo. 523; Wright v. Doniphan, 169 Mo.
601.   The  city  holds  its  streets  as  trustee  for
the  public  and  has  no  power  to  alien  them  or
give  them  away.   Schopp  v.  St.  Louis,  117  Mo.
137;  1  Dillon  on  Mun.  Corp.  (4  Ed.),  Secs.  97
and 383; Glaessner v. Brewing Ass'n, 100 Mo. 508;
Sugar Refining Co. v. Elevator Co., 82 Mo. 124, 101
Mo. 192; Railroad v. Illinois, 146 U. S. 453; Reighord
v. Flynn, 189 Pa. St. 355; State ex rel. v. Murphy, 134
Mo. 562; State v. Railroad, 103 S. W. 1139; Cummins
v. St. Louis, 90 Mo. 269; State ex rel. v. St. Louis, 161
Mo. 371.   (5)  The road in question was a public road
before it became a part of the city of St. Louis and
was thereafter a public street of said city.   It was such
by long continued use.   Buschmann v. St. Louis, 121
Mo. 523; Becker v. St. Charles, 37 Mo. 13; Heitz v. St.
Louis, 110 Mo. 618; Harper v. Morse, 49 Mo. App. 470;
R. S. 1899, Sec. 9472.   (6)  Respondent is estopped by
the conduct of itself and those in privity of title with
it to deny the public character of the road.   Tolby v.
Staunton, 119 Mass. 404; Moore v. Walla Walla, 2
Pac. 187.

*Lyon & Swarts* for respondent.

(1) The action of the county court is a nullity—
it can have no vitality for any purpose.   Appellants

are relying on the proceedings of the county court, and if the proceedings are a nullity there is nothing in law on which to rely. In re Essex Avenue, 121 Mo. 105; Seafield v. Bohne, 169 Mo. 547; Mitchell v. Railroad, 138 Mo. 331; Fringo v. Buford, 112 Mo. 149; Ziebold v. Foster, 118 Mo. 354; Mulligan v. Martin, 125 Mo. App. 634. (2) Mere proof of intermittent public travel over unoccupied land on different tracks, as suited convenience, and depending on the condition of the alleged road, is insufficient to establish a highway by user. Brinck v. Collier, 56 Mo. 165; Garnett v. Slater, 56 Mo. App. 212; Railroad v. Woolard, 60 Mo. App. 633; Rosenberger v. Miller, 61 Mo. App. 428. (3) The respondent is the owner of the strip covered by the alleged road. Whatever easement the public obtained has been wholly abandoned by it for the past thirty years. Johnson v. Rasmus, 141 S. W. 590; State v. Culver, 65 Mo. 609. (4) The public had not used the alleged road for a continuous period of about thirty years; no public money or labor was expended on the alleged road for the period of ten consecutive years, or at any time, either during the period of its alleged public use or since it was abandoned. R. S. 1899, Sec. 9472; State v. Meier, 136 Mo. App. 123; State v. Macy, 72 Mo. App. 432. (b) Sec. 9472, R. S. 1899, did apply to the city of St. Louis. It was first enacted in 1879 (R. S. 1879, Sec. 6987), and was amended in 1883, but not as to the matter here relied on. Sec. 9446, R. S. 1899, was first enacted in 1899, providing that the article did not apply to counties having a population of 100,000. The enactment of section 9446 in 1899 did not affect the legal status of the alleged road, which, under the law and the statutes in force at that time had been abandoned by the public. (5) Estoppel is good only between the parties and those in privity with them. Where it applies, we find such elements as dedication of street or road, the platting of streets, sale

246 Mo.—29

of property bounded by streets or roads, the erection of improvements in reliance thereon. No such element is in this case. Cattle v. Snyder, 10 Mo. 763; Hempstead v. Easton, 31 Mo. 142; Schenck v. Stumpf, 6 Mo. App. 381; Curtis v. Browne, 63 Mo. App. 431.

ROY, C.—This case involves the question as to whether Sulphur avenue running south from Manchester avenue to Wilson avenue, in the city of St. Louis, a distance of about 1800 feet, is a valid street.

The plaintiff, about two years before the trial, constructed a building known as the shipping shed, extending from the west to a point ten feet within the alleged street. It also built a brick kiln thirty-eight feet in diameter on the street. The city was proceeding to remove those structures as obstructions to the street when the suit was begun to enjoin such action on the part of the city. The decree was for the plaintiff and the injunction was made perpetual. The city has appealed.

The river Des Peres crosses the alleged street about seven hundred feet south of Manchester avenue.

Appellant claims that Sulphur avenue has been traveled as a public highway since 1862 until within the last few years, while the respondent claims that it was never a defined and recognized line of public travel, but that such travel as there was on or near that portion south of the river was the random and irregular travel such as occurs *ad libitum* over open land, and not confined to a definite track; and that the travel north of the river was of the same character except in dry weather.

Our attention is called to the language used by the learned trial judge during the trial, as follows: "I am very much impressed with what evidence I have heard so far that the use that was made of that road ought not to be dignified by calling it a user. There

never was any use of that road any more than there was of any open land in the county over which people might drive; there never was any road there, and never was any public work done on it, and absolutely the only thing from the testimony that would lead anybody to suppose that there was a road there was the fact that there was a bridge across the river Des Peres."

Owing to that claim made by the plaintiff and the above language of the trial court, we will state at some length what are the conceded facts or facts established by the evidence for the plaintiff.

On July 24, 1862, the territory through which the street runs was outside the city, and in St. Louis county. The county court of that county on that date made an order establishing the road under the name of Cheltenham avenue, now the street in controversy, thirty feet wide on the line between lots twelve and thirteen in Graham's Subdivision of the Sulphur Springs tract. Lot thirteen is on the east and lot twelve on the west. That order was void by reason of the fact that the petition on which it was based was signed by only eight persons instead of twelve as the law required, and it was void for other reasons not necessary to mention.

In 1865, Samuel Hambleton and James Green purchased lot thirteen from Thomas Allen. There were at that time several railroad tracks crossing the property near the north end and other tracks have been built since. Mr. Green, who is the president of the plaintiff company and has been in business on that land ever since 1865, testified that he knew the land since about two years before his purchase in 1865, and that there was then "a little bit of a country road over there," and that it was fenced on both sides from Manchester avenue to Wilson avenue with good fences, plank fences, except that the part on the east side north of the river was a hedge fence. About the time the

road was opened, a bridge was built by the county across the river Des Peres. The following instrument was read in evidence:

"Cheltenham, Mo., May 20, 1866. To the Hon. John H. Long, St. Louis, Mo.—We, the undersigned citizens of Cheltenham, do petition the Honorable County Court of St. Louis County, Mo., to widen the space between the bridge and the fence of the new road at Cheltenham so that the stock can have easy access to the water," which was signed by Charles D. Devlin and six others. The following was also in evidence:

St. Louis, June 25, 1866.

To the Honorable County Court of St. Louis County.

Gentlemen: The undersigned petitioners, having been notified to remove their fence from the stone abutments of the bridge across river Des Peres on County road at Cheltenham, Cheltenham avenue, would most respectfully beg leave to state if they should be required by your honorable body to remove the fence it would be almost impossible for them to protect their property from trespass of their neighbors' cattle. They would have to erect flood gates, which, in our opinion, would wash away at every freshet of the river, which rises and falls very rapidly, and a very large quantity of drift floats down the river at every heavy rain, and consequently would carry away any gate we could possibly construct; and, we would further state the removing of our fence would not benefit any person in the neighborhood, and the majority of the petitioners who ask for the removal of the fence are not property holders, and as we believe the petition was gotten up for the express benefit of Mr. Charles Devlin, and your petitioners would most respectfully ask your Honorable body to allow our fences to remain as it now is. If granted their request, they will ever pray, etc.

(Signed)   SAMUEL HAMBLETON,
JAMES GREEN,
CHARLES M. FIELD.

Also this report:

OFFICE GENERAL ROAD SUPERINTENDENT,
Sept. 3, 1866.

To the Hon. County Court of St. Louis County.

Gentlemen: The petition of Charles Devlin and others at Cheltenham, St. Louis County, for widening Cheltenham avenue, at the crossing of the river Des Peres so that the stock can have

easy access to the water has been referred to me, Samuel Hambleton, James Green and Chas. M. Field, having joined their fences and the wing walls of the bridge across the said river together, have been notified to remove their fences from the property of the county, whereupon the said Samuel Hambleton, James Green and Chas. M. Field have filed their petition for allowing their fences to remain as they are, which having also been referred to me by your order, I have examined the place of complaint, and beg leave to report as follows: Cheltenham avenue is 30 feet wide, and the bridge is in the middle of the road; the bridge and wing will occupy 26.4 feet in width, so that 1.9 feet space will be left between the wing walls and the fences to give the stock access to the water in case the fences should be removed; this narrow space is, in my opinion, insufficient for stock to strain itself through the narrow space into the said river. No stock of any kind can go back easy, because the river bank is too steep and the space between the wing walls too narrow. If Cheltenham avenue would be 40 feet wide I should recommend the opening of the said river, but as the width is only 30 feet and the stock cannot get an easy access to the water, I respectfully recommend to allow the fences to remain as they are.           Respectfully, your obedient servant,

JOHN ALT,
Genl. Road Superintendent.

Also the following:

ST. LOUIS, January 23, 1875.

To the Hon. County Court of St. Louis County.

Gentlemen:   We, the undersigned citizens and property owners of Central township, petition your Honorable body to grant your disposition regarding the grading of Cheltenham avenue from the Old Manchester road to the New Manchester road,

Which was signed by the Laclede Fire Brick Co., by James Green, Prest., and by forty-five others.

And this report:

COUNTY ENGINEER'S OFFICE,
February 22, 1875.

Hon. County Court, St. Louis County:

Gentlemen:   I beg leave to report the following upon this petition referred to me, of Charles B. Gratiot et al., for the grading of Cheltenham avenue. The avenue has a width of only 30 feet, and is about a mile in length connecting the Market street road at Cheltenham, with the old Manchester road, near the Watson road. It passes over very rough and steep ground,

Clay Products Co. v. St. Louis.

and to excavate it, even to very steep grades will require quite a large amount of work. A new bridge also will have to be built over the river Des Peres, as the present one will not be adequate if the avenue is to be improved.

The following is an estimate of the approximate cost of improving said avenue, as called for in the petition, viz.:

Excavation, 14,000 Cu. Yds. at 20cts ..............$2,800 00
Bridge and Culvert masonry 300 perches at $5 .... 1,500 00
56 lineal feet of new superstructure, at $12.00.... 672 00

$4,972 00

As this road is under the control of the general road superintendent, I am unable to say whether this amount can be spared at the present time from his appropriation to be applied to the improvement petitioned for.

Respectfully, yours obediently,

JOHN G. KELLY,
County Engineer.

Also the following:

OFFICE GENERAL ROAD SUPERINTENDENT,
ST. LOUIS, April 19, 1875.

To the Hon. County Court.

Gentlemen: Respecting the enclosed petition of Charles B. Gratiot, et al., for the grading of Cheltenham avenue, I have the honor to report as follows:

This avenue runs from the Manchester road at Cheltenham station to the Old Manchester road, near its intersection with the Watson road, and is about one mile in length. If properly graded it would no doubt become an important thoroughfare, but at present it is nearly impassable for loaded teams. The proposed improvement, according to the estimate of the county engineer, would cost in round figures the sum of 5000 dollars, which estimate is based upon a maximum grade of 7.5 feet in 100 feet, and a clear width of 24 feet, which still would leave the road in an unsatisfactory condition because the road being only 30 feet wide, the embankments would have to be made partly on private property, and the sides of the excavations would have to be made nearly perpendicular, which is very objectionable in such narrow cuts.

I cannot recommend this work at the present time; first, because there are not sufficient funds credited to my department for the present year; and secondly, because the road is only 30 feet in width, and the proposed work cannot be done properly unless the road is widened to at least 60 feet.

Respectfully,                    AUG. ELBRING,
Genl. Road Superintendent.

In 1869, Hambleton and Green incorporated their business under a charter running twenty years. The corporate name was the Laclede Fire Brick Manufacturing Company, and in 1889 its charter was renewed under the same name, which has since been changed to its present name.

In 1882, the plaintiff acquired that part of lot twelve lying south of the river under two different deeds, each conveying an undivided half, and both expressed to be "subject to the public road lying between lots twelve and thirteen."

In 1889 the old expiring corporation made to the new one a deed to its property in lots twelve and thirteen, the description of the land in lot twelve being followed by the words, "containing 11.77 acres, including one-half of Sulphur avenue, and 11.26 acres excluding said avenue."

In 1876, by the "Scheme and Charter," the territory which includes Sulphur avenue was taken inside the city of St. Louis. In 1882, by ordinance, the name of the street was changed from Cheltenham avenue to Sulphur avenue. On February 14, 1889, the city by ordinance provided for replacing the old bridge with a new one of iron and appropriating $1000 for that purpose. The new bridge was thereupon constructed.

Mr. Davis, a member of the St. Louis bar, testified for plaintiff:

"Originally when you looked south from Manchester Road—Manchester avenue now—on the right hand was called the Sulphur Spring cottage. I think a man by the name of Fields lived there, and I think he had a boy about my age that used to be there quite often, and afterwards Jack Howard and somebody else had a roadhouse there and a picket fence on the outside and hedge fence on the inside; that is, going down to the creek. On the left-hand side there was, I believe, an osage orange hedge fence. Where the office of the

Laclede Fire Brick Company now is, in the corner of the place, was a flower bed and an asparagus bed, and so forth, put there by the Icarians. As you went south to the bridge, it is flat and level ground, and as you cross the bridge there is a little depression. From there on up the hill, there was originally what you might call a country road. There were wagon tracks there, fenced on both sides, and that condition existed until it slid in. It slid north and slid east, and then the rain actually made gutters in it, and it was an utter impossibility to go up and down there.

"Q. You are describing up and down from the bridge, up to what is now Wilson avenue? A. Wilson avenue is over in the next hollow. It then became impassable. I tried to drive over it myself and couldn't.

"Q. How long would you say that it was that you tried to drive over it? A. A good many years ago. It is more than twenty and possibly twenty-five. It may be thirty. I can recollect well the occurrence of trying to go up there with a wagon that had side springs, the only one my father had, and the gutters would let the horse down so low that the buckler would come up over the top of his back.

"Q. And under those conditions you couldn't go up the hill? A. I could go over it horseback; I have ridden it that way.

"Q. On the same theory, you could go over a mountain? A. Yes, sir; it slid in and gutters washed in there."

Mr. Green further testified for the plaintiff as follows:

"Q. Now, Mr. Green, the fact is, is it not, that this whole land here has, so to speak, caved in here [indicating in plat], from the brick kiln up to Wilson avenue? A. No, it is caved in about halfway up to Wilson avenue.

"Q. Do you know how that happened? To what was that due? A. When we were digging out that cliff

alongside, right straight through there, it would slide in most every day.

"Q.   When did that begin to slide in, or cave in? A.  Oh, fifteen or twenty years ago.  It used to come pretty near down to the river.

"Q.   What is that?  A.  The slide of that used to come pretty near into the river.

"Q.   You mean when the land slid, the earth used to come almost down to the river Des Peres?  A. Yes, sir; when we built No. 2, as the rain came down.

"Mr. Charles.  When you built what?  A.  Factory No. 2.

"Mr. Swarts (resuming examination).  Q.  Some of that land that was cut, you mean, from the side there, came down and slid?  A.  Yes, down on to the second story of the building."

The evidence shows that factory No. 2 was constructed at the foot of the hill, about twenty years before the trial, and that near the same time excavations were made along the base of the hill for railroad switch tracks, and also for the factory, and that, by reason of those excavations, the land began to slide toward the river and eastward in and along Sulphur avenue.  At some time thereafter the road became impassable and ceased to be used.

The following letters were put in evidence:

St. Louis, Sept. 27, 1902.
Charles Varrelmann, Esq.,
      Street Commissioner, City Hall, City.
      Dear Sir:  We wish to call your attention to the bridge over the river Des Peres, on Sulphur avenue.  The roadway is full of holes, and if something is not done soon the city is liable to have a damage suit on its hands, as a horse would be very apt to break his leg if he went through.
      We simply thought we would call your attention to this matter.
            Yours very respectfully,
                  LACLEDE FIRE BRICK COMPANY,
                        GEORGE R. BLACKFORD,
                              Secretary.

CITY OF ST. LOUIS,

STREET DEPARTMENT, COMMISSIONER'S OFFICE.

Chas. Varrelmann, Commissioner,

W. O. Hemenway, Asst. Commissioner,

Julius G. D. Bischoff, Secretary,

ST. LOUIS, Mo., Sept. 30, 1902.

Geo. R. Blackford,

Secretary Laclede Fire Brick Co.

Manchester and Sulphur Avenues.

Dear Sir: Replying to your letter of the 27th inst., relative to the condition of the roadway of the bridge over river Des Peres on Sulphur Avenue, I would respectfully advise that the same was referred to Mr. Gayler, bridge engineer for the city, who reports that said avenue, not being a public highway, the city is not liable for the maintenance of said bridge.

In view of the above report, I feel that I can take no action in the matter.

Respectfully,

CHAS. VARRELMANN,

Street Commissioner.

Also an ordinance of the city as follows:

21914. An ordinance to condemn a right of way for sewers and water pipes over a part of proposed Sulphur avenue between Wilson avenue and Manchester avenue.

Be it ordained by the Municipal Assembly of the city of St. Louis, as follows:

Section One. For the purpose of permitting the construction or laying repairs and perpetual maintenance of sewers and water pipes, a certain strip of land thirty feet in width shall be condemned for the uses above mentioned. The center line of said strip of land to be coincident with the dividing line between lots 12 and 13 of "D. W. Graham's Subdivision of Sulphur Spring Tract," said center line also being coincident with the center line of proposed Sulphur avenue as laid out in said subdivision.

Section Two. The city counselor is hereby authorized and instructed to cause said strip of land to be condemned for the purposes hereinbefore mentioned, according to law.

Approved March 30, 1905.

That ordinance has never been repealed. The evidence shows that from about the time that territory was taken inside the city the bridge over the river Des Peres was repaired by the city every year or two until about 1900.

Some of the evidence for the plaintiff tended to support its claim that there was never a well-defined passable road from the river south to Wilson avenue, while the evidence for the defendant tended to show the constant use of Sulphur avenue by the public over its whole length. All the evidence, however, showed that the hill, beginning about three hundred feet south of the river, was steep, and at muddy seasons almost if not entirely impassable for loaded wagons.

I. On the question of fact we have no hesitation in holding that from 1862 until about 1890 the street in question was a public highway, with fences on both sides thereof, and with a well-defined track over which the public traveled. It was at times in muddy weather a very bad road, almost or entirely impassable for loaded wagons, but it was, nevertheless, a public highway and so considered by everybody concerned, including this plaintiff.

The order of the county court opening the road was void. However, we can consider it to the extent of concluding that there was a demand at that time for a road there, and the county court was of the opinion that there was sufficient demand to justify opening it, and that the route was a practical one. In 1866, Mr. Green, who has always been a strong force in the business of the plaintiff, signed the communication to the county court recognizing the road and showing that the fences were there on both sides of the road.

Mr. Green stated that two years before he and Hambleton bought, there was a road there with good fences on both sides of it. In 1875 the plaintiff and forty-five others petitioned the county court in regard to grading the road. In 1882 the plaintiff acquired the land west of the road and south of the river by deeds, which stated that they were subject to the road. In 1889 the plaintiff in the character of the first corporation whose charter was expiring, made a deed to itself

as a new corporation, showing by the language of that deed the existence of the street.

In 1889 the city replaced the old bridge with a new one, and repaired it until about 1900; and even as late as 1902 the plaintiff in its letter to the street commissioner recognized the existence of Sulphur avenue and wanted the city to repair the bridge. When that road was taken into the city under the Scheme and Charter in 1876 it was a well-defined public road, fenced on both sides, on which there was a bridge over the river, and it had been traveled as such by the public for more than ten years, and such use had been acquiesced in by the owners of the land over which it passed. The use of a road for ten years with the acquiescence of the owner makes it a valid road. [State v. Wells, 70 Mo. 635; State v. Walters, 69 Mo. 463; Milling Co. v. Riley, 133 Mo. 574; Bauman v. Boeckler, 119 Mo. l. c. 200.]

Sec. 10446, R. S. 1909 (R. S. 1899, Sec. 9472), prescribing how a road may be acquired by user, had no application to this street at the time it was taken into the city, as that statute was not enacted until 1879.

When taken into the city the road became a city street, as provided by section 10 of article 1 of the Scheme and Charter, which provided that the interest of St. Louis county in all public roads and highways should vest in the city of St. Louis. Independent of such a provision it would seem that such would be the result of taking a public road into a city. It was so treated in Wright v. City of Doniphan, 169 Mo. 601, l. c. 606.

It is contended that section 10446 of the statute above quoted applies to city streets, and that an abandonment for ten years destroys the right of the public to use the street. It is not clear in this case that there was such a nonuse for ten years; yet, even if such were the case, we hold that the statute does not apply. It does not purport to do so. It is a special statute of

limitations applicable to public roads outside of incorporated cities.

There is a long line of cases in this State based upon the doctrine that the right of a city and the public to the use of a street cannot be lost by abandonment or adverse possession. [St. Louis v. Railroad, 114 Mo. 13; Williams v. St. Louis, 120 Mo. 403; Wright v. City of Doniphan, supra.] The application of that section of the statute to city streets was not discussed in those cases, and for a good reason. It was not supposed to have any reference to city streets. The wisdom of Sec. 1886, R. S. 1909, providing that the Statute of Limitations shall not apply to "lands given, granted, sequestered or appropriated to public use," has been so thoroughly justified by experience and so often approved by this court that it is now too late to assail it. There are greater reasons why city streets should not be subject to destruction by nonuse or adverse possession than can be found applicable to any other kind of property. No other kind of public property is subject to more persistent and insidious attacks or is less diligently guarded against seizure. The city was not estopped by the act of the street commissioner when he declared that Sulphur avenue was not a street, nor by the ordinance condemning the right of way for the purpose of laying sewers and water pipes, nor by any other act or omission of the city officers shown in evidence.

The judgment is reversed and the cause remanded with directions to enter a decree dissolving the injunction and dismissing the plaintiff's bill, and for such other proceedings as may be in accordance with the law.

*Blair, C.*, concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.