## UNION ELECTRIC LIGHT & POWER CO. v. SNYDER ESTATE CO. et al. *
### No. 9606.
Circuit Court of Appeals, Eighth Circuit.
April 24, 1933.

*Rehearing denied August 14, 1933.

Walter H. Walne, of Houston, Tex. (Edgar Shook, of Kansas City, Mo., Carl L. Crocker, of Eldon, Mo., Tom Martin Davis and S. H. German, both of Houston, Tex., Theodore Rassieur, of St. Louis, Mo., and Baker, Botts, Andrews & Wharton, of Kansas City, Mo., on the brief), for appellant.

James A. Reed, of Kansas City, Mo. (John E. Wilson, of Kansas City, Mo., Sid C. Roach, of Jefferson City, Mo., and Henry A. Bundschu, Leon M. Bailey, James J. McNamara, Burr S. Stottle, and Wilson, Bundschu & Bailey, all of Kansas City, Mo., on the brief), for appellees.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from a judgment assessing damages in a condemnation proceeding in which appellant, plaintiff below, sought to acquire an easement to store water and to flood lands. For convenience, the parties

will be referred to as they were designated in the lower court.

The property involved is known in the record as Hahatonka, and is located in the Ozark Mountains on the Big Niangua river, about fifteen miles above the point of confluence of the Niangua and the Osage rivers, and about forty-nine miles up the river from the Bagnell Dam. The building of this Bagnell Dam necessitated the securing of an easement for the storage of waters and the flooding of land. The dam was constructed as a part of a project for the development and transmission of electric power. The promotion of the project began in 1924, when a permit was given by the Federal Power Commission to construct the dam. In 1926, acting under the Federal Water Power Act (41 Stat. 1063 [16 USCA §§ 791–823), this commission issued a license for the construction of the dam to an elevation of 655 feet above mean sea level, with the right to flood the territory above the dam to that elevation. By mesne transfers and assignments this license was acquired by plaintiff, Union Electric Light & Power Company. In 1929, actual construction of the dam began, and it was constructed to an elevation of 660 feet above sea level, instead of 655 feet, and this, by appropriate amendment of the license, was authorized by the Federal Power Commission.

The present condemnation proceedings were brought under section 21 of the Federal Water Power Act (41 Stat. 1074 [16 USCA § 814]), which provides that any licensee who cannot acquire by contract or pledge "an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts."

Defendant Snyder Estate Company, a corporation, owned the property, and the defendant Byron G. Bliss, trustee, was made a party as the holder of an unreleased deed of trust against the property. Both defendants answered the petition in condemnation which was filed in the lower court. The general effect of each answer was to deny the right of plaintiff to condemn the property.

The federal statute above quoted contains provision that the practice and procedure in any proceeding for the purpose of condemning property under the act "shall conform, as nearly as may be, with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated." Section 21 (16 USCA § 814).

After hearing, the court in form entered a judgment of condemnation, and appointed three commissioners to assess the damages. The commissioners in due time filed a report assessing damages in the sum of $143,413. Plaintiff and defendants excepted to this report, whereupon the court, pursuant to the Missouri practice, ordered a jury trial of the issue. The trial of the proceeding before the jury resulted in a verdict assessing damages at $350,000, and from the judgment entered thereon plaintiff has appealed.

The record discloses 100 assignments of error, 47 of which are argued by plaintiff in a brief of 557 pages. These assignments may be summarized or grouped under the following general headings: (1) The court erred in refusing to dismiss the panel of jurors because of their disqualification; (2) there was misconduct of counsel; (3) the court erred in admitting evidence as to the value of the alleged power site separate and apart from the value of the land and in giving and refusing instructions relative thereto; (4) the court erred in giving and refusing instructions as to the rights acquired by plaintiff, and in refusing plaintiff's request to file a stipulation limiting its right under its license; (5) the court erred in refusal of motions to strike out evidence adduced on direct examination, after cross-examination showed its incompetence; and (6) the court erred in giving and refusing instructions going to the proper elements of damage.

The court denied plaintiff's motion to dismiss the panel of jurors, urged on the ground that certain jurors had read a newspaper article appearing in the Jefferson City Post Tribune of November 29, 1931. November 30th was occupied with the examination of jurors on their voir dire, the court adjourning before challenges were exercised. On reconvening the next morning, and before peremptory challenges were exercised, counsel for plaintiff inquired of the prospective jurors whether they had read the article referred to. Two of the jurors said they had read the headlines only, one that he had read part of the article, another that he had read half

of the article, and two that they had read the entire article. Based on this showing, counsel for plaintiff moved that the panel of prospective jurors be discharged. The motion being denied, counsel for plaintiff then moved that those jurors who had read the article be dismissed from the panel, and this motion was likewise denied. Peremptory challenges were then exercised, and there remained on the jury one juror who had read the headlines, one who had read half the article, and two who had read the entire article.

█ Regardless of the character of the article, the first motion was properly denied because it asked for the discharge of the whole panel, while only certain of the members of the panel had read the article in whole or in part. The second motion was also properly denied because a juror is not disqualified from the mere fact that he has learned something of the facts, or of what are printed in a newspaper as the facts of the case. Reynolds v. United States, 98 U. S. 145, 25 L. Ed. 244; Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; Gallot v. United States (C. C. A. 5) 87 F. 446; Dimmick v. United States (C. C. A. 9) 121 F. 638; Allen v. United States (C. C. A. 7) 4 F.(2d) 688; State v. Lewis, 323 Mo. 1070, 20 S.W.(2d) 529; McGuire v. Amyx, 317 Mo. 1061, 297 S. W. 968, 54 A. L. R. 644; State v. Herring, 268 Mo. 514, 188 S. W. 169.

█ True, the jurors might from the reading of a newspaper article have formed such an opinion, or have been so prejudiced as to disqualify them upon challenge for cause properly presented to the trial court. In this case, however, no inquiry was made of the individual jurors as to whether they had from the reading of the offending article gained any impression or formed any opinion as to any material fact connected with the case. The qualification of jurors is peculiarly a matter for the determination of the trial court, and that court is of necessity vested with a very large discretion. Remus v. United States (C. C. A. 6) 291 F. 501; Connors v. United States, 158 U. S. 408, 15 S. Ct. 951, 39 L. Ed. 1033; State v. Craft, 299 Mo. 332, 253 S. W. 224. It appears affirmatively that counsel for defendants, after the motion had been made, asked the presiding judge if he would not "ask these jurors who have seen this article if it will affect their verdict in this case, so that we may have a record. If they say it will affect their view, I think then we would have to have a new jury, but if they say it will not affect it,

then it will be for Your Honor to exercise your discretion in the matter." This procedure was opposed by counsel for plaintiff. The court then admonished the jury that anything they might have read in the newspaper should be wholly disregarded and dismissed from their minds. It was the duty of counsel to ascertain by proper examination at the time the jury was impaneled, the existence of any ground of objection to the jurors, and failing so to do, he cannot thereafter raise any objection which might have been discovered and seasonably presented to the trial court. State v. Murray, 316 Mo. 31, 292 S. W. 434; Killion v. Dinklage, 121 Neb. 322, 236 N. W. 757.

The mere fact that jurors may erroneously have obtained information concerning the case from a newspaper article does not necessarily constitute prejudicial error requiring their discharge. We have examined the newspaper article in question and cannot say that it was of such a character as necessarily to create prejudice, and we are clear that there was no error in denying plaintiff's motion.

█ Complaint is made that defendants' counsel did not confine their statements, evidence, or arguments to the issues of fact, but went far beyond them, and in so doing appealed to the passion and prejudice of the jury. It is, however, contended by defendants' counsel that the challenged statements were not excepted to when made; that they were provoked or invited by remarks of opposing counsel; and that in any event they did not transcend the bounds of legitimate argument. In our view of the issues, we need not consider these contentions, because the case must be reversed on other grounds, and it seems unlikely that the same or similar remarks will be made on another trial. The sole question for determination is the amount of compensation to be allowed defendants for the taking and damaging of their property. Rev. Stat. Missouri 1929, § 1344 (Mo. St. Ann. § 1344); Missouri Pac. R. Co. v. Roberts, 187 Mo. 309, 86 S. W. 91; Chicago Great Western R. Co. v. Kemper, 256 Mo. 279, 166 S. W. 291, Ann. Cas. 1915D, 815; State ex rel. v. Huddleston (Mo. App.) 52 S.W.(2d) 33. It goes without saying that all evidence should be limited to that issue, and arguments of counsel should be confined to the law and pertinent evidence, with such inferences as may properly be drawn therefrom. In the trial of a jury case there are reciprocal duties devolving upon counsel for the respective parties and the trial judge: (1) Counsel for the respective parties, in address-

ing the jury, should confine their remarks to a discussion of the issues and the evidence. (2) Opposing counsel should except to any remarks of counsel which are claimed to be improper, so that the trial judge, in an orderly way, may have an opportunity of correcting the error, if there be one, and thus prevent the necessity of granting a new trial. (3) The trial judge should be vigilant to protect suitors in their right to a verdict uninfluenced by improper remarks and appeals to passion and prejudice. It is essential that these reciprocal duties be discharged during the orderly trial of a case, as it is often difficult or impossible for the appellate court to determine from the record whether the challenged remarks have been provoked, and whether on the whole they have been prejudicial. Counsel must not be permitted to invite or incite error and speculate on the result. We cannot say on this record that the remarks of counsel were so clearly prejudicial as to require a reversal of this case.

It is urged that the court erred in permitting counsel for defendants to cross-examine witnesses on matters not fairly within their direct examination. In direct examination, plaintiff's witness Rudolph, who was a hydraulic engineer, testified at length, based upon research, relative to floods in the Osage and Niangua rivers, the elevation of the water at Hahatonka by the dam, the electrical capacity of the plant, and some details of its operation. On cross-examination he was asked a question in which the purported ownership of all the stock of plaintiff was read to him, and he was then asked: "Now, in view of that fact that all of the stock, except nine shares, was owned by the North American Edison Company, you would say, wouldn't you, that the control was in the North American Edison Company?"

During the reading of the list of purported stockholders, counsel for plaintiff interrupted with this: "Your Honor, is this cross-examination?" The court responded: "Yes, it is cross-examination." Counsel then said: "We except."

It is now insisted that this line of cross-examination was improper because it was not addressed to anything included in the direct examination of the witness. It must be conceded that the objection was very meager; but as the case is to be reversed, we should perhaps consider it for such bearing as it may have on a retrial of the case.

■ It is the rule of this court that the party who calls a witness may restrict his cross-examination to the subjects of his di-

rect examination, and a violation of this right, if prejudicial, is reversible error. If the cross-examiner wishes to inquire of the witness concerning matters not touched upon in the direct examination, he must make the witness his own. Rose v. United States (C. C. A. 8) 45 F.(2d) 459; Hill v. Wabash R. Co. (C. C. A. 8) 1 F.(2d) 626; Tucker v. United States (C. C. A. 8) 5 F.(2d) 818; Safter v. United States (C. C. A. 8) 87 F. 329; Heard v. United States (C. C. A. 8) 255 F. 829; Illinois Cent. R. Co. v. Nelson (C. C. A. 8) 212 F. 69; Minnesota & Ontario Paper Co. v. Swenson Evap. Co. (C. C. A. 8) 281 F. 622; Simmons Hardware Co. v. Southern R. Co. (C. C. A. 8) 279 F. 929.

■ The above-quoted portion of the cross-examination of this witness, while improper, yet, standing by itself, could not be said to constitute prejudicial error. But there were other questions propounded to the same witness on cross-examination, relative to the ownership of the stock of plaintiff, all outside the scope of the direct examination, and about which the witness knew little, if anything. This cross-examination impressed upon the jury the size and extent of the holdings of plaintiff, the foreign character of the controlling factors of plaintiff, and that the ownership of substantially all the stock of plaintiff was in the North American Edison Company. The witness was interrogated as follows:

"Q. Now, in turn, the North American Edison Company is owned by the North American Company, isn't it, controlled by it? A. I am not entirely familiar with that. I think they are.

"Q. Now, the North American Company is what is commonly known as the Power Trust, isn't it?"

Counsel for plaintiff then said:

"We reserve a bill of exceptions to that statement. Your Honor, I object to it."

"The Court: It all bears on the question of draw down and the use of the plant."

"Mr. Walne: We take exception."

The previously quoted cross-examination which we have held was improper, laid the foundation for this equally improper cross-examination. These extraneous facts, if they are facts, served only to arouse the prejudice of the jury. This witness was further cross-examined as to his familiarity with Moody's Manual of Investments. The witness, answering that he knew there was such a manual, was then asked if assuming that

the North American Company owned subsidiaries, among which about fifty were named by counsel, and "that it operates in the States of Ohio, Missouri, Illinois, Iowa, Wisconsin, Michigan, District of Columbia; that it has total assets of $908,759,283.00 as of December 31, 1929; now, assuming that the control is in the company that operates all of these companies, including the control through the Edison Company of your company, can you say that this control may not at any time see fit to change or alter the present policies of your company?" The witness answered: "They may see fit to alter certain parts of the policy or all of it, as far as that goes."

No specific objection was made to this last question, but an objection once made to a question preserves the objection to similar questions without the necessity of repetition, and as the case is to be remanded for a new trial, we think it proper to say that we are of the view that the question was objectionable.

A similar course of cross-examination was indulged in as to other witnesses. Witnesses were interrogated in detail as to all companies which plaintiff operated, controlled, or owned stock in, and in each instance the assets, capital stock, or bond issues of such corporations were included in the question. An objection was interposed by counsel for plaintiff as to the part of the questions including reference to assets and capitalization of these companies, which was overruled, and the court stated that the objection and exception might be considered as having been interposed to the entire line of examination.

Plaintiff's president was asked on cross-examination about a hearing on November 2, 1931, on an application presented by plaintiff to the Public Service Commission of Missouri for authority to purchase 3,330 trust certificates representing about 26 per cent. of the common stock of the Laclede Power & Light Company, and this was objected to as not proper cross-examination, and the objection overruled. The witness was then led into an examination of the record made at that hearing, and was required to answer why plaintiff wished to purchase this stock, the earnings of the stock, the advantages of consolidation, and who controlled the balance of the stock. The witness was then asked: "Your company is controlled by what company?" Here counsel for plaintiff interposed a lengthy objection, the gist of which was that the examination was improper. The court said: "I think it is all incompetent, but we have gone into it and we are nearly through and we might as well go on. I take it that we are nearly through. If it is error it is already in there." The witness answered: "The common stock of the Union Electric Light and Power Company is all owned by the North American Edison Company, excepting these directors' qualifying shares."

Counsel for defendants was then permitted to ask who plaintiff's directors were, and to show that two of them were officers and directors of the North American Company; that one of them was an officer of the North American Company; that three officers of the North American Edison Company were officers of the North American Company; and that other intercorporate relationships, to a degree that must have bewildered the jury, existed.

These inquiries threw no light upon the single issue to be tried by the jury; but it is observed the evidence was not overlooked in counsel's argument to the jury, during which he said: "I presume he (referring to one of plaintiff's attorneys) was brought here as the expert lawyer for this great organization embracing many companies, starting with this company, which is itself a combination of companies, which is, in turn, controlled by the Edison Company, which is a combination of a great many companies, and which is, in turn, controlled by the North American, with assets of nearly a billion dollars' and with ramifications that spread over the nation like a spider's web."

This evidence not only took the jury far from the simple issue to be tried, but it distracted their attention from that issue, and brought before them the size and wealth of plaintiff and its affiliates, and the above-quoted argument of defendants' counsel was calculated to keep fresh in the minds of the jury the size and wealth and foreign character of the plaintiff. To permit evidence of the wealth of a party litigant, except where position or wealth is necessarily involved in determining the damages sustained, is prejudicial error. Quinette v. Pullman Co. (C. C. A. 8) 229 F. 333; Washington Gaslight Co. v. Lansden, 172 U. S. 534, 19 S. Ct. 296, 43 L. Ed. 543; Laidlaw v. Sage, 158 N. Y. 73, 52 N. E. 679, 44 L. R. A. 216.

The cross-examination of the engineer, Mr. Rudolph, and of Mr. Egan, the company's president, above referred to, considered in connection with the argument of counsel based thereon, was prejudicial.

■ As a further attack upon plaintiff's right to appropriate the property involved, under the power of eminent domain, the defendants requested, and the court, over plaintiff's objection, instructed the jury that while the proceeding was based upon the right of the Federal Government to control and improve navigable waters, "nevertheless the principal use of the reservoir as shown by the evidence is for the purpose of enabling the plaintiff company to produce electricity and to sell the same to companies, individuals, or the public. The court instructs the jury that the plaintiff herein is a company organized for profit, that its purpose in constructing the dam and creating the reservoir was for industrial purposes and that there should be no diminution of damages herein on the theory that the plaintiff is engaged as an agency of the United States Government exclusively for some public benefit. The damages awarded, if any, should be exactly the same as though a private party desired to acquire the property for a private use and had authority to so proceed."

As an abstract statement of law, the instruction is not objectionable, but it was not addressed to any issue in the case, and the court should not have given its aid in injecting such an issue into the case. Whether the plaintiff was a private corporation, or acting as a governmental agency, had no bearing upon the question as to how much the defendants were damaged. In either event the damages were the same.

■ Complaint is made that witnesses were permitted to testify to the value of the property piece by piece. It appears from the evidence that there is a spring of large capacity which, before the flooding, was used to pump water to certain parts of the premises to operate a hydraulic ram, to grind corn, and sharpen tools. Mr. Howard, an engineer called by the defendants, testified that there could have been developed from the spring a water power with a capacity of 684,000 kilowatt hours. The water impounded by the dam destroyed such potential development. The witness was then permitted to testify that this was worth $9,000 a year for use on the premises, and capitalized, its value was $150,000. The jury was instructed that this evidence was to be considered in its relation to the value of the whole estate. The testimony gave a value to this potential power as a part of this estate, and not as a separate, abstract item.

Plaintiff concedes that it would have been permissible to show this potential source of water power, its capacity, and nature, but contends that to attempt to enlighten the jury by having a witness say what component part of the entire value of this property was embodied in this feature was error. Neither jurors nor witnesses should be permitted to give fantastic nor speculative uses and adaptabilities to property, nor to give a value thereto. This property was adapted for use as a summer resort, country estate, or public park. It had already been developed to some extent, and there was evidence of plans for further development. Testimony as to the value of the property, based on its availability for water power development, was properly admissible as affecting its market value. Ford Hydro-Electric Co. v. Neely (C. C. A. 7) 13 F.(2d) 361. The existence of water power capable of producing sufficient electricity to provide for the needs of a country estate, public park, or summer resort, was an element of value that a prospective purchaser might well have considered, and to permit the witness to place his estimate on its value for use on the property was but to permit him to place a value on an item that any prospective purchaser would have valued. The admission of evidence touching the value of property appropriated in condemnation cases must be left largely to the discretion of the trial judge. We think there was no error in receiving this testimony. Mississippi & Rum River Boom Co. v. Patterson, 98 U. S. 403, 25 L. Ed. 206; Shoemaker v. United States, 147 U. S. 282, 13 S. Ct. 361, 37 L. Ed. 170; City of St. Louis v. St. Louis, I. M. & S. R. Co., 272 Mo. 80, 197 S. W. 107; Louisville & N. R. Co. v. Western Union Telegraph Co. (C. C. A. 6) 249 F. 385; Louisville & N. R. Co. v. White Villa Club, 155 Ky. 452, 159 S. W. 983; In re Blackwell's Island Bridge Approach, 198 N. Y. 84, 91 N. E. 278, 41 L. R. A. (N. S.) 411, 139 Am. St. Rep. 791; Colorado, etc., R. Co. v. Brown, 15 Colo. 193, 25 P. 87.

■ Plaintiff complains that the witness testifying relative to the water power was not qualified to testify to the value of this property, but he did not attempt to qualify as an expert on real estate values. He was a civil engineer of wide experience and eminently qualified to testify as to the value of the power site. Louisville & N. R. Co. v. Western Union Telegraph Co. (C. C. A. 6) 249 F. 385. In any event, counsel for plaintiff made no objection to the qualifications of this witness to testify as to this value, and he cannot for the first time make such objection here.

Plaintiff also contends that the testimony of this witness was inadmissible because he based his estimate of value upon what it would cost to obtain a similar amount of power from other sources, or in other words, its replacement value. The cost of reproduction has a tendency to show present value, and we think this testimony admissible in condemnation cases. City of St. Louis v. St. Louis, I. M. & S. R. Co., 272 Mo. 80, 197 S. W. 107; Tillamook County v. Johnson, 96 Or. 623, 190 P. 159, 10 A. L. R. 448; Russell v. St. Louis Southwestern R. Co., 71 Ark. 451, 75 S. W. 725; Kennebec Water Dist. v. Waterville, 97 Me. 185, 54 A. 6, 60 L. R. A. 856. The testimony of this witness went to the value of the power site. A market value could scarcely have been established, and as said by this court in Hard & Rand v. Biston Coffee Co., 41 F.(2d) 625: "Where value is an issue, the inquiry may properly be allowed to take a wide scope. Evidence of the cost, selling price, replacement value, depreciation, use value, junk value, location of the property, local demand for it, and many other things may be shown. Many elements properly enter into the determination of 'fair value,' and evidence bearing on the question may be admissible, although it may have but little weight. Counsel could more properly argue against the weight of the evidence than its admissibility."

In the instant case plaintiff's argument is addressed to the weight of this evidence, rather than to its admissibility. In this same connection we may note the complaint of plaintiff of the action of the court in refusing an instruction concerning the value to be given this water power. The requested instruction refers to the evidence of the witness Howard as follows: "Defendants' witness Howard, after indulging in certain speculations and conjectures, placed a specific valuation on the waterpower site."

This part of the instruction is palpably argumentative. The instruction also required the jury to disregard the valuation given by this witness and that of all other witnesses who adopted it. We are of the view that the trial court correctly instructed the jury on this feature of the case. The court limited the effect of this evidence by the following instruction: "Solely to the end that the jury may have some conception of the potentialities of the water power of said spring, and the flow therefrom, considerable testimony was admitted regarding the manufacture of electric energy and the value thereof. This testimony and the estimated value of the electric energy produced will be wholly disregarded by the jury, save only in so far as it will enable the jury to determine whether the property as a whole may possess a greater market value because of its potential water power and the probability that such would meet the needs and requirements of the whole estate."

In instructing the jury as to the extent of plaintiff's appropriation, the lower court first charged as follows: "Such easement under the law and the facts of this case authorized and justified the plaintiff in removing from the area embraced in the four tracts described in the evidence herein as tracts A, B, C and D respectively, all fences, buildings, trees, brush, debris and other obstructions except the three dams located on tract A, to create an artificial lake or reservoir thereon *up to elevation 660 feet* above mean low tide at Biloxi, Miss., and to maintain the same at any level between elevation 630 and 660; * * * and, in addition thereto, *temporarily and intermittently to flood said four tracts of land up to elevation 670, such flooding to occur only at such times as flood waters running down the Niangua River elevate the surface of the water above the 660-foot level as the result of back water influence,* as that term has been explained or defined in the evidence."

The court also instructed the jury as follows: "The evidence shows without dispute, as the court remembers it, that the right which plaintiffs sought and did acquire in such acreage that does so lie above elevation 660 feet and below elevation 670 feet will be the right to flood the same at such times, but only at such times as freshets or floods occur in the Niangua River. The engineers for both parties have explained that flooding at such times will occur as the result of what they designate as backwater influence. Both parties agree that any flooding above the 660 level will be periodic and not permanent and of comparatively short duration when it does occur. * * * The defendants will, notwithstanding this condemnation suit, have the right to use all of the land above the 660 elevation for any and all purposes to which the same may now be put, subject only to the qualified right as herein defined which plaintiff has by this suit acquired."

After having so instructed the jury, the court changed its mind as to the applicable law and specifically withdrew the foregoing instructions and others to like effect, and in an additional instruction said to the jury:

"Now, that charge is withdrawn from the

jury. My attention was at the time, or since then, called to the fact that the judgment of this court condemns this property without limitation up to the 670-foot level at that point, so that it would be within the right of the plaintiff, if it desired to do so, to make such clearing along the shores of the lake or the mill race, including the property above the lake, as it might see fit, up to the 670-foot level.

"Now, in connection with that I call your attention to the statement of the plaintiff that it will not make that clearing, but I am also calling your attention to the fact that it has the right to make that clearing, so that you gentlemen will take all of that into consideration in making up your verdict for damages in the case, bearing in mind that whatever assurances one owner might now make with respect to its purposes concerning the property, that another owner would not be bound by any statement of that sort, so it is for you gentlemen to determine, on all the evidence in the case, in connection with its right to make the clearing there, you will consider all of that; the fact that it has not made it, of course, you will consider in connection with your consideration of damages.

"Now, in connection with some charge I gave you a while ago, I am going to give you this additional charge:

"The court instructs the jury that under the judgment rendered in this case all of the property below contour line 670 on tracts A, B and D is taken, condemned and appropriated, and on tract C all of the property below the contour line 665 is taken, condemned and appropriated, and the defendant in this case is entitled to recover its damages for such taking, condemnation and appropriation of all of said property, and cannot in any action hereafter recover for the flooding of said areas, regardless of the permanency or intermittence of such flooding."

Further the court in this additional instruction said:

"The jury are further instructed that the height of the dam may, by permission of the Federal Government, be hereafter raised or to the extent of the drawdown may hereafter, by the consent of the Federal Government and the Union Electric Light & Power Company, be lowered.

"It appears from the record that the plaintiff offered in open court a stipulation by which it specifically offered to forego and waive any right to clear or permanently to flood above the 660 level, so that it might be clearly shown by the record that it had only the right temporarily and intermittently to flood the lands between the elevation of 660 feet and 670 feet. Plaintiff excepted to the additional instruction and to the withdrawal of the instruction as originally given, and to the ruling of the court in refusing its stipulation.

"It must be remembered that prior to the time of the trial of this proceeding, the physical structures which will impound the waters of this river had actually been completed. The license issued by the Federal Power Commission, under which plaintiff asserts the right to appropriate the property in question, was amended by substituting for the elevation 625 and 655 feet, 630 feet and 660 feet respectively, so as to provide for the clearing of the reservoir for a normal pool elevation of 660 feet above mean sea level."

As amended this provision of the license reads as follows: "The Licensee shall cut and remove or destroy to the satisfaction of said District Engineer, all brush and trees from that zone within and adjacent to the area to be submerged which is included between the elevation of 630 feet above mean sea level and 15 feet horizontally from the outside of elevation 660 feet above mean sea level, and shall remove or destroy all floatable refuse or other material within said area to be submerged."

The case was tried on the theory reflected by the court's first charge to the jury, which was later withdrawn.

The physical structures as actually completed are such, from an engineering standpoint, as will maintain a normal pool elevation at 660 feet above sea level and no more. The maps, plans, specifications, and drawings are all prepared on that basis. Mr. Howard, an engineer testifying for the defendants, said that when a flood occurred in the Niangua river and the water went above 660 on the Hahatonka property as a result of backwater influence, the flood would be periodic and go off in a very short time, just as it did before the dam was built; that the word "backwater" referred to water which is caused by a freshet, and that if there is any backwater influence above the 660 elevation, and if it does get above the spring or anywhere around 661, 662, or 663, it will go off promptly if the flow through or over the dam is normal, and that in his opinion the flooding above 660 would likely be of short duration. Testifying with reference to the spring on the premises, he said: "I do

not anticipate that occasional back waters over that spring would do the spring any harm in the sense of depleting its flow."

As further indicating the theory upon which the case was tried, counsel for defendants, in propounding a question, said to the court: "We will assume for the purpose of this question that the plaintiff has constructed a dam calculated to raise the height of this water to the 660 foot level at will, if they can get enough water to raise it to that point, and that they also acquired the right to flood the land above the 660 level up to the 670 foot level *in case of back water.*"

In propounding a question to one of their witnesses, defendants' counsel said: "I will say, however, that the flood up to the 670 foot level is presumed to only take effect when there has been a freshet of some kind."

To another witness counsel for defendants said: "It is in evidence here, and you may assume it to be the fact, that these power people have the right to flood this land up to the 660 foot level at will and in times of freshet and flood go up to the 670 foot level."

During the course of argument at the trial, the court, in response to some contention, said: "The judgment now, Senator, is 660 feet for the maximum regular lake level; that is the lake level now; that is the judgment now. Now, then, of course, there is a further judgment condemning up to 670 on the theory that what has been designated here as backwater influence and floods would throw the water back up to 670 feet."

It is clear that by its additional instructions the court permitted the jury to assess defendants' damages on the theory that the plaintiff had acquired the right permanently to flood the lands up to an elevation of 670 feet. Under the testimony, if permanently so raised there would be in times of freshet and flood a further flooding by reason of the backwaters. It is apparent that if the court was in error in this instruction it was an error that seriously prejudiced the rights of the plaintiff and enhanced the award of damages to the defendants. The structure being completed, there was no room for speculation or uncertainty as to the extent of water storage or flooding, as that could be accurately determined as a matter of engineering. If these permanent structures should be later so altered or changed as to raise the elevation, then, confessedly, damages would result not covered by the condemnation proceedings as actually conducted. For such additional damage, it seems clear the plaintiff would be liable, if, indeed, it might not be

enjoined from making such changes or alterations. But it is contended by defendants that the so-called judgment in condemnation entered in this case conferred upon plaintiff the right permanently to raise the water elevation to 670 feet, and that for that reason the defendants had a right to recover damages on the theory that there had been an actual appropriation of their property up to that elevation.

The only authority for entering the so-called judgment in condemnation is to be found in the Missouri statutes. After providing that a party entitled to condemn may apply to the circuit court of the county where the lands to be affected, or any part thereof, lie, or to a judge thereof in vacation, by petition setting forth generally the construction and maintenance of necessary dams, and the appropriation of lands submerged by the construction of such dams, with a description of the real estate or other property which the company seeks to acquire, with the names of the owners if known, and praying the appointment of three disinterested freeholders to assess the damages which the owners may sustain in consequence of the erection and maintenance of the proposed structures, it is provided that upon the filing of such petition, a summons shall issue, giving the owners of the property ten days' notice of the time when the petition will be heard. No provision is made for an answer to this petition, but by section 1342, Revised Statutes of Missouri 1929 (Mo. St. Ann. § 1342), it is provided that: "The court, or judge thereof in vacation, on being satisfied that due notice of the pendency of the petition has been given, shall appoint three disinterested commissioners, who shall be freeholders, resident of the county in which the real estate or a part thereof is situated, to assess the damages which the owners may severally sustain by reason of such appropriation, who, after having viewed the property, shall forthwith return, under oath, such assessment of damages to the clerk of such court," etc.

It is observed that this statute contains no provision or authorization for the entry of judgment in condemnation, but apparently contemplates the entry of an order appointing commissioners to assess damages.

Section 1342 further provides that the commissioners shall make return under oath of the amount of the damages which are then to be paid to the clerk of the court, and also provides that: " * * * On making such payment it shall be lawful for such company to hold the interest in the property so

appropriated for the uses aforesaid; and upon failure to pay the assessment aforesaid, the court may, upon motion and notice by the party entitled to such damages, enforce the payment of the same by execution, unless the said company shall, within ten days from the return of such assessment, elect to abandon the proposed appropriation of any parcel of land, by an instrument in writing to that effect, to be filed with the clerk of said court, and entered on the minutes of the court, and as to so much as is thus abandoned the assessment of damages shall be void."

Section 1344 provides for a review by the court in which the proceedings were had, on written exceptions to the report of the commissioners filed by either party, and that "the court shall make such order therein as right and justice may require, and may order a new appraisement, upon good cause shown. Such new appraisement shall, at the request of either party, be made by a jury, under the supervision of the court, as in ordinary cases of inquiry of damages;. but notwithstanding such exceptions, such company may proceed to erect said telephone or telegraph line, or construct said road or railroad; and any subsequent proceedings shall only affect the amount of compensation to be allowed."

 Conceding, without deciding, that the so-called judgment in condemnation entered in this proceeding entitled the plaintiff permanently to flood the land to an elevation of 670 feet, did the entry of such a so-called judgment obligate the plaintiff to appropriate and pay for the property to that extent, and was such so-called judgment a final judgment which could not be modified during the subsequent proceedings in the trial court? We have already observed that the statute makes no provision for the entry of such a judgment, and it is further to be noted that the statute specifically confers upon the condemnor the right of abandoning the appropriation within ten days from the return of such assessment. The Supreme Court of Missouri has held that in the event the proceeding is retried before a jury, the condemnor may abandon the proceeding within ten days after the assessment of the damages by a jury. State ex rel. v. Fort, 180 Mo. 97, 79 S. W. 167. By whatever name the order or judgment may be designated, it is clear that it did not, when entered, finally impose upon plaintiff the obligation of taking, appropriating, and paying for the property therein described, because the statute specifically provides that the plaintiff might abandon the proceeding within ten days after

the jury had returned a verdict. At the time, therefore, that the court changed its instructions, the plaintiff had not become obligated by the so-called judgment to take and pay for the property described. It had in fact not taken and appropriated the property above the elevation of 660 feet, and if it had the right so to do under the so-called judgment, then it had the right to abandon any part of the property not already appropriated, and it offered so to do by a stipulation tendered in open court. The so-called judgment in condemnation may have been a finality in so far as it adjudicated the right of the plaintiff to take the property described under the power of eminent domain; but it was not a final judgment in the sense that it required the plaintiff to take, appropriate, and pay for such property. It is only after the landowner's right to compensation has become vested, that the plaintiff may not dismiss or abandon its proceeding, and in the instant case there had only been an actual appropriation by the plaintiff up to the elevation of 660 feet. A so-called judgment, entered under this Missouri statute, could not make a final and complete determination of the controversies between the parties. It did not terminate the litigation on its merits, and hence was not a final judgment. Clark v. Kansas City, 172 U. S. 334, 19 S. Ct. 207, 43 L. Ed. 467; Deslions v. La Compagnie Generale Transatlantique, 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973; Ft. Dodge Portland Cement Corp. v. Monk (C. C. A. 8) 276 F. 113; Carmichael v. City of Texarkana (C. C. A. 8) 116 F. 845, 58 L. R. A. 911; Gladys Belle Oil Co. v. Mackey (C. C. A. 8) 216 F. 129.

The so-called judgment not being final, was not subject to the rule that the court cannot modify or change an order or judgment after the expiration of the term at which it was entered. Standard Savings & Loan Ass'n v. Aldrich (C. C. A. 6) 163 F. 216, 20 L. R. A. (N. S.) 393; Dangerfield v. Caldwell (C. C. A. 4) 151 F. 554.

The right of eminent domain is statutory, and the enforcement of it is subject to a compliance with the conditions and requirements prescribed by statute. Western Union Telegraph Co. v. Louisville & N. R. Co. (C. C. A. 5) 250 F. 199; State v. Grimm, 314 Mo. 242, 284 S. W. 490; City of St. Louis v. Smith, 325 Mo. 471, 30 S.W.(2d) 729; City of St. Louis v. Glasgow, 254 Mo. 262, 162 S. W. 596; Orrick School Dist. v. Dorton, 125 Mo. 439, 28 S. W. 765. The jurisdiction conferred on the court being statutory, the court in entering its judgment could

not go further than permitted by statute. United States v. Moorehead, 1 Black (66 U. S.) 488, 17 L. Ed. 80; Reid Creamery & Dairy Supply Co. v. City of Philadelphia, 274 Pa. 251, 118 A. 11; Dickel v. Bucks-Falls Elec. Co., 306 Pa. 504, 160 A. 115; White v. Kansas City & M. Ry. & Bridge Co., 101 Tenn. 95, 45 S. W. 1073; Tudor v. Chicago & S. S. R. T. R. Co. (Ill. Sup.) 27 N. E. 915.

The Supreme Court of Missouri has held that the order appointing the commissioners is interlocutory only. St. Joseph Terminal R. Co. v. Hannibal & St. J. R. Co., 94 Mo. 535, 6 S. W. 691; State ex rel. v. Edwards, 104 Mo. 125, 16 S. W. 117. See, also, Luxton v. Bridge Co., 147 U. S. 337, 13 S. Ct. 356, 37 L. Ed. 194.

It is apparent that the petition as filed with the lower court, seeking the appointment of commissioners, was based upon the right conferred upon the plaintiff as defined in the license issued by the Federal Power Commission. By appropriate reference this was made a part of the petition, and in turn, all the maps, plats, drawings, and diagrams were embodied therein; and we should not presume that it was the purpose of the court to enter a judgment which conferred greater rights than the plaintiff had acquired from the duly constituted authorities. But, in any event, the rights acquired were such as the plaintiff had a right to waive or abandon, and as said by the Supreme Court of Missouri in St. Louis, K. & N. W. Ry. Co. v. Clark, 121 Mo. 169, 25 S. W. 192, on rehearing at pages 906, 907, 26 L. R. A. 751: "Upon an assessment by a jury, in case the road has already been constructed, it seems too plain to require more than a statement of the proposition that the damage should be ascertained in view of the condition in which the unappropriated land is left by the use actually made of the easement. * * * No good reason can be seen why the condemning company should not have the right to announce, upon the trial, and have made a matter of record, if not done in its petition, the manner in which the right of way should be used; otherwise, the jury would have the right to make the award on the basis of the most injurious use to which the easement could be lawfully applied in the construction and operation of the road. * * * Our opinion is, therefore, that the offer made by the railroad company in this case, upon the trial, to so construct its road as to reserve to the landowner two crossings, was a matter going to the damage to be allowed, though incidentally the reservation may have limited to a certain extent the use of the easement."

See, also, City of Cape Girardeau v. Hunze, 314 Mo. 438, 284 S. W. 471, 47 A. L. R. 25; City of Chicago v. Lord, 276 Ill. 571, 115 N. E. 397; Olympia Light & Power Co. v. Harris, 58 Wash. 410, 108 P. 940; City of Seattle v. Faussett, 123 Wash. 613, 212 P. 1085; Milwaukee Elec. Ry. & Light Co. v. Becker, 182 Wis. 182, 196 N. W. 575.

We conclude that the court correctly declared the law in its first instruction, and that it was in error in withdrawing that instruction and in giving the additional instructions referred to, especially in view of the offer of plaintiff to stipulate an abandonment and waiver of any right permanently to take or flood lands above the level of 660 feet.

Complaint is made of the ruling of the court in denying defendants' motion to strike out the testimony of Gutzon Borglum. Mr. Borglum is a sculptor artist, who has devoted a great deal of attention to park building and the parking of highways, and has been interested directly and indirectly in matters of that sort. He has had very broad training and wide experience, and among other works he had to do with the planning and carving of Stone Mountain memorial near Atlanta, and is the sculptor in charge of the work of carving upon Mt. Rushmore, in the Black Hills of South Dakota, the statues of various renowned Americans. Among other testimony given by him relative to the property involved was an expression of opinion as to its value. The property involved was not commercial property. It consisted of lakes, hills, forests, brooks, and natural curiosities, and is possessed of great scenic beauty. Under such circumstances the owner should be permitted to show as best he can, the value of the property for the purposes and uses for which it is peculiarly adapted, and to which it may be devoted. Mississippi & Rum River Boom Co. v. Patterson, 98 U. S. 403, 25 L. Ed. 206; North American Telegraph Co. v. Northern Pacific R. Co. (C. C. A. 8) 254 F. 417; St. Louis, M. & S. E. R. Co. v. Continental Brick Co., 198 Mo. 698, 96 S. W. 1011; San Diego Land & Town Co. v. Neale, 78 Cal. 63, 20 P. 372, 3 L. R. A. 83; Idaho-Western R. Co. v. Columbia Conference of Evangelical Lutheran Augustana Synod, 20 Idaho, 568, 119 P. 60, 38 L. R. A. (N. S.) 497. No good purpose would be served by a further discussion of this question. We think the court properly denied the motion to strike this testimony.

It is also contended that the court erred in denying plaintiff's motion to strike certain other testimony offered by the defend-

ants as to the depreciated value of the property, when it appeared on cross-examination that the witness erroneously assumed that after the appropriation the portion of the property condemned was open to the public, and that the public had the right to operate boats thereon, fish in, and otherwise use the bay formed thereon. The court, however, instructed the jury that the public had no such right, and if there was any error in admitting the testimony it was cured by the court's instruction, and cannot be said to have prejudiced the plaintiff.

The flooding of the property submerged a road leading to Bridal Cave, located on the Snyder estate. The road, which was the means of access to this cave, went over land of another party. The court refused to strike out the testimony relative to the depreciated value of the Bridal Cave tract, and this is urged as error because it developed that the witness based his opinion as to the lessened value on the loss of access to the tract over the road. The evidence showed that the road had been used by the public for twenty years with acquiescence of the owner. Under the Missouri decisions this became a public highway by prescription. Borders v. Glenn (Mo. App.) 232 S. W. 1062; School Dist. No. 84 v. Tooloose (Mo. Sup.) 195 S. W. 1023; Laclede-Christy Clay Products Co. v. City of St. Louis, 246 Mo. 446, 151 S. W. 460; State v. Wells, 70 Mo. 635. The right to recover compensation for the damage to the land through the destruction of the highway, even though the highway was not upon defendants' land, would seem to be clear. United States v. Welch, 217 U. S. 333, 30 S. Ct. 527, 54 L. Ed. 787, 28 L. R. A. (N. S.) 385, 19 Ann. Cas. 680. There was, therefore, no error in denying plaintiff's motion to strike this testimony.

Defendants contended at the trial that the spillway capacity of the dam was insufficient, and that during floods the water would pile up and stand on their land above the 660 foot elevation longer than it otherwise would. Plaintiff's witnesses testified that from government records and from other sources going back some eighty-four years, they had determined that the dam was adequate to handle any flood that might occur. Defendants' witnesses, however, expressed the opinion that the dam was insufficient, and in effect testified that an experience of eighty-four years was insufficient upon which to base an accurate finding as to the possibility of maximum floods. These witnesses were permitted, over objection by

plaintiff, to testify as to floods in Kansas, Arkansas, North and South Carolina, Georgia, Vermont, Alabama, Texas, Connecticut, Maryland, Pennsylvania, Tennessee, Minnesota, Arizona, and California, and to discuss and detail facts about the designs of dams in Texas, South Carolina, North Carolina, Washington, Quebec, California, Tennessee, Montana, and Utah. As these were all collateral matters, they could properly be admitted in evidence only for the purpose of giving the jury an illustration or an example as to what might occur on the Osage river. There was, however, no proof of similarity of existing conditions, and testimony as to other watersheds and other dams would necessitate an inquiry into the rainfall, topography, character of soil, the rapidity with which the water drains off from lands, and the type and character of dams. Unless substantially the same conditions are shown to exist, the evidence of similar occurrences should not be admitted. Lake Superior Loader Co. v. Huttig Lead & Zinc Co., 305 Mo. 130, 264 S. W. 396; Continental Life Ins. Co. v. Searing (C. C. A. 3) 240 F. 653; Lake Erie & W. R. Co. v. Mugg, 132 Ind. 168, 31 N. E. 564, 565. This testimony should not have been permitted to go to the jury.

As bearing upon the damages resulting from the building of the dam and the creation of the lake, defendants were permitted to show conditions prevailing in and about Lake Taneycomo. This testimony, which referred to silt, mud, and exposed banks on Lake Taneycomo, was admitted without objection on the part of plaintiff; but when another witness testified to the appearance of the shore line it was met with objection. This witness testified as to the growth of willows, and the presence of débris, silt, mud banks, and mosquitoes. There was a showing that the conditions on the Niangua river and the White river, on which Lake Taneycomo was built, were somewhat similar. The results from drawing off water could reasonably be expected to be substantially the same under somewhat similar natural conditions prevailing, and we think it was not an abuse of discretion in the court to admit this testimony.

Plaintiff attempted to show the benefit to the property at Lake Taneycomo by converting the land into building sites for a summer hotel and summer residences, and that there had been a steady and continued increase in the market value of the land forming the shores of that lake, and that tourists were attracted by hundreds of thousands. The court properly excluded such

testimony. It would have involved the jury in an exploration of many collateral and confusing issues.

On direct examination Le Roy Snyder testified that the 5,400 acres owned by the Snyder estate were worth $1,000,000. On cross-examination he was asked if he did not state in a brief filed by the defendants, and to which his signature was attached, that the property was worth from $750,000 to $1,000,-000. He admitted that he did, and on direct examination his counsel offered, and the court received, in evidence the entire brief. While we do not think the brief should have been received, we do not believe its receipt was prejudicial to the plaintiff. There was nothing contained in the brief that did not otherwise appear in the evidence, and it was so far removed in time that it could not have been prejudicial.

A witness was allowed to testify that one hundred fifty Missourians had written him letters, and all but two or three of them placed this property first in the list of the seven beauty spots of the state. However, as a part of the examination of its witness W. W. Ellis, plaintiff itself introduced an exhibit in the form of a pamphlet which, if it did not exceed, at least equaled any and all of the statements and the evidence which the defendants introduced with reference to the beauty of this property. The evidence was not admissible, it was clearly hearsay; but we cannot say, in this condition of the record, that it was prejudicial.

The evidence showed that State Highway No. 5 was the nearest highway to the property, and that before the formation of the lake the highway crossed the Osage river on a bridge, while at the present time the travelling public using the road is required to cross on a ferry, and that the ferry had a capacity of only six cars and charged 60 cents for a car with one passenger and 10 cents additional for each additional passenger. Plaintiff insists that this was a general damage, and hence should not be allowed to be shown. The court carefully instructed the jury on this point. It stated the proper rule of damages to the effect that: "By such, that is, by general damages, the court means damages, if any, to those parts of defendants' lands not subject to the easement or directly affected by it and which damages are suffered in common by all of the tracts of the land in the neighborhood of the artificial lake or reservoir. Such damages are general, even though suffered by defendants' said remaining land to a greater degree than those suffered by the rest of the neighborhood in common." The court also told the jury not to take into consideration such inconveniences as were "common to the other land owners in the neighborhood, and whose lands are not subject to an easement for plaintiff's reservoir and do not front on any portion of said artificial lake."

The court charged the jury that in awarding damages it should take into consideration every element of annoyance, disadvantage, or inconvenience, if any, resulting from appropriation of the land, which would involve the reasonable judgment of an intending purchaser as to the market value of the property involved. Where a public improvement makes access to one's property inconvenient, and makes it less accessible than it was before, even though the improvement is not upon or does not abut upon the land, the owner may recover as part of his damages, such loss in value as the resulting inconveniences and inaccessibility may have caused. United States v. Grizzard, 219 U. S. 180, 31 S. Ct. 162, 55 L. Ed. 165, 31 L. R. A. (N. S.) 1135; Mason City & Ft. D. R. Co. v. Kennedy (C. C. A. 8) 192 F. 538; Hill v. Kimball, 269 Ill. 398, 110 N. E. 18. The court properly submitted this question to the jury for its determination.

Conceding that the lower court correctly charged the jury on the question of special benefits, plaintiff contends that the court unduly restricted plaintiff in the introduction of evidence bearing on this issue. The jury was fully advised of the nature of this improvement and all benefits, if any, which could reasonably be expected to follow from it. We think the instructions fairly presented this issue to the jury.

Plaintiff also urges that the court erred in giving and refusing various instructions. These include, for the most part, questions already considered, but so far as they do not, it is observed that plaintiff has pointed out no error in either the giving or refusing of the instructions to which its argument relates, and hence they are not properly before the court.

We have considered the other alleged errors urged by plaintiff but are of the view that those not already passed upon do not constitute prejudicial error, and no useful purpose would be served by giving them further consideration.

We conclude that the judgment appealed from should be and is reversed, and the cause is hereby remanded to the lower court, with directions to grant the plaintiff a new trial.