## UNION ELECTRIC LIGHT & POWER CO. v. SNYDER ESTATE CO. et al.

### No. 245.

District Court, W. D. Missouri, W. D.
June 17, 1936.

Edgar Shook and R. R. Brewster, both of Kansas City, Mo., for plaintiff.

James A. Reed, Henry Bundschu, John E. Wilson, and Leon M. Bailey, all of Kansas City, Mo., for defendants.

OTIS, District Judge.

The trial of this case began February 4, 1935. It continued during the greater part of three weeks, taking up in all seventeen court days. Approximately two additional days were given by the jury to the consideration of its verdict. Defendants' motion for a new trial was timely filed. Although the motion several times was set for argument, argument of the motion was long delayed by reason of the engagements of counsel elsewhere or their necessary absence from the district. The motion was argued May 16 and May 18, 1936, and now is to be ruled.

This was the second trial of the case. It had been tried in the Central Division of the District before Judge Reeves. The duration of that trial was nine weeks. From the resulting judgment, an appeal was taken. The judgment was reversed and the case remanded. Union Electric Light & Power Co. v. Snyder Estate Co. et al. (C.C.A.) 65 F.(2d) 297. By agreement of the parties, the second trial was had in the Western Division at Kansas City.

The plaintiff had condemned and taken certain property of defendants as an incident to the construction of a huge dam across the Osage river and the consequent flooding of lands contiguous to that river and its tributaries. From the damages awarded defendants by commissioners, an appeal was taken to the District Court. At the trials the issue was: What damages, if any, were sustained by defendants from the taking of their property? At the first trial the damages were fixed by the jury at the sum of $350,000. At the second trial the damages were fixed at $200,000. Commissioners, appointed by the court, had assessed the damages at $143,413.

Defendants believe the damages assessed at the second trial are inadequate. Hence this motion.

The property affected (called Hahatonka) is a site in the Ozark Mountains of Missouri, famous for its scenic beauty, enriched also by history and legend. Certainly its character was and still is unique. Difficulty of evaluating in money a property so unusual and of estimating the damages sustained was great. Quite naturally opinions as to values differed. The task imposed on court and jury, however easily described in words, in no sense was easily worked out.

Many years ago Hahatonka was acquired by R. M. Snyder. Its present owners are his sons (the title is held by the defendant Snyder Estate Company, a family corporation). They are men of high character, much esteemed. In all sincerity they believe that the damages awarded them are insufficient.

Upon the argument of the motion for a new trial, the chief insistence of learned counsel for defendants had to do with the jury which heard the case, with the imposture of one of the twelve jurors and the conduct of another.

1. Inquiry touching the jury, when it began, looked to larger matters than the two relatively insignificant things which actually were developed. From the fact that on the voir dire examination one juror (Mr. Jackson, a fine upstanding old gentleman, who became foreman of the jury) disclosed that, after he was summoned, a stranger had sought to talk to him about the case, counsel for defendants suspected that improper influences had been brought to bear upon the jury. They asked and were given every opportunity thoroughly to investigate that matter. They were permitted to file an amendment to the motion for new trial. They were given extensions of time for further investigation. They were authorized to subpœna and examine witnesses in open court. Even the rule which forbids jurors impeaching their own verdict was ignored (plaintiff's counsel making no objection) and the very deliberations of the jury room were laid bare through the testimony of jurors. No technicality, it was thought, should be permitted to shield guilt, if guilt there were, if that guilt involved the integrity of a trial in a court of justice.

But all the investigation aided by the processes of the court and the most skillful examination and cross-examination of witnesses developed nothing sinister. The truth is, there was nothing to develop.

Just as defendants and their counsel were men of the highest character and integrity, so, in no less degree, were the officers of plaintiff and the reputable attorneys who represented it. No attorney on either side in this case would have tolerated for one second the slightest deviation from the high road of rectitude and professional honor.

The two matters that were developed concerned jurors Mariner and Andersen.

### Juror Mariner.

One C. L. Mariner was summoned as a member of the panel from which the jury would be chosen. When those summoned were called for the voir dire examination, an individual present in the courtroom answered to that name. He was not challenged and so became one of the twelve. He continued in that capaciy throughout the trial and during one day of the jury's deliberation.

On the morning of the second day of the jury's deliberation, before the jury had reassembled, the foreman of the jury advised the judge that one of the jurors (he was not at first able to identify him by name, but it turned out to be Mariner) was acting strangely in the jury room, that he would neither participate in the jury's discussion or balloting, that what little was said by him was incoherent, that, in the opinion of the foreman and other jurors, he was not in his right mind.

Being thus advised, the judge called counsel into chambers, gave them the information he had received, and urged that they agree that Mariner be excused.

At the beginning of the trial a stipulation had been entered into by the parties whereunder the judge was authorized to excuse as many as two of the twelve jurors, should that become necessary, the parties agreeing that the case should proceed to a verdict with the jurors remaining. The judge had suggested this stipulation in view of the possible length of the trial. Counsel readily agreed it was a wise precaution.

But there was some doubt (at the time and in the mind of the judge only) as to whether the case of Mariner fell within the intention of the stipulation. Therefore the judge asked counsel to stipulate orally that Mariner should be excused. That was done and he was then excused both under the oral and the written stipulation.

After Mariner was excused and before a verdict was reached by the jury it was learned by the judge, by the marshal, and by counsel for both parties (and that the court finds to be a fact from the testimony introduced in connection with the submission of the motion for new trial) that Mariner was not the C. L. Mariner who had been summoned as a juror, but W. J. Mariner, a brother of C. L. Mariner, who responded to the summons of C. L. Mariner and answered to his name.

Although counsel for defendants knew this fact before the verdict, they took no action (such as a motion to discharge the jury) based upon that knowledge. It is now urged, however, as a reason for a new trial.

Upon the argument of the motion, answering the contention of plaintiff's counsel that failure to act after knowledge constituted a waiver of any objection to the fact that Mariner wrongfully had become a member of the jury, counsel for defendants said it was too late to object after Mariner had been excused. Clearly the contention is not so answered. If it was too late to make the objection after Mariner was excused and before verdict, it is certainly too late to make the objection after verdict.

If the objection now to Mariner has such merit as that because of it the verdict should be set aside, it would have supported a motion to discharge the jury before the verdict. A party cannot gamble with the possibility of a favorable verdict and then thereafter, when the verdict proves unfavorable, raise a question he might have raised before the verdict.

There is still another reason why this question should be ruled against defendants. The parties stipulated that, in a certain contingency, the case might be decided by a jury of eleven or of ten men, that even a lawful juror or two lawful jurors might be excused by the judge if sufficient reason for excusing him or them should arise. The fine purpose of this stipulation was to prevent a mistrial from some adventitious cause which could not be foreseen nor prevented. Discovery that a lawful juror was so ill mentally that he could not function would have warranted his discharge under the stipulation. That a juror was incompetent because he was an imposter certainly would have been equally within the purpose of the stipulation.

Moreover, if the objection had not been waived and if there had been no stipulation, more would need be shown than has been shown to justify a new trial on such a ground as this. Mariner, who was not a lawful juror, did not influence the verdict. He was excused before the verdict and because the jury, through its foreman, urged that he be excused because he was irrational. It is idle to say that such a man under such a circumstance influenced the verdict reached by the eleven remaining after he was excused. His presence on the jury (while he was present) did not prejudice the defendants.

But it is said that the absence of the lawful juror who would have been upon the jury except for Mariner's imposture may have prejudiced defendants. That, however, is the purest speculation.

We can only speak of him who would have served in the place of Mariner as "X". Even his identity is unknown. Whether he would have favored plaintiff or defendants is unknown. How then can it be said that his absence from the jury prejudiced defendants? And certainly a new trial will not be granted except for that which did prejudice the moving party. If, perforce the statute (28 U.S.C. § 391 [28 U.S.C.A. § 391]), a new trial will not be granted even on account of some erroneous ruling, in the absence of an affirmative showing that the error was prejudicial (see Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314), certainly it should not be granted on account of some mere accident (which neither court nor parties could foresee nor prevent) in the absence of an affirmative showing that the accident was prejudicial.

### Juror Andersen.

The opening of the door of the jury room which was permitted in this case did disclose the fact that juror Andersen exerted a real influence on his associates. Apparently it was Andersen who held the verdict down. Possibly (even probably), except for Andersen, the jury would have agreed on a larger verdict. It scarcely can be said, however, that he was unreasonably obdurate. To meet the views of his associates he raised his estimate of damages from his first estimate of $25,000 to an estimate of $200,000, the amount upon which all jurors finally agreed.

Of course, no verdict is to be set aside because it has developed that one juror has

influenced his associates from their first notions of what is right. And learned counsel for defendants make no such argument. Their attack on juror Andersen is this, that he made himself a witness in the jury room.

On the voir dire examination Andersen testified that he never had been at the site of Hahatonka, nor at the dam erected by plaintiff across the Osage river, nor at the Lake of the Ozarks (created by the dam) save at its western extremity (more than 100 miles from Hahatonka). Notwithstanding this his testimony, several of the jurors say that during the jury's deliberations Andersen informed them that he had been to the site of Hahatonka and that it was not damaged. So, say defendants' counsel, he made himself a witness.

Upon the issue of fact as to whether Andersen had been at Hahatonka before the trial evidence was heard.

The only positive testimony on the subject was that of Andersen who swore that he testified truthfully at the voir dire, that he never had been at Hahatonka nor elsewhere on the Lake of the Ozarks than at its western extremity. The testimony of other jurors that Andersen said he had been at Hahatonka, of course, is no proof (as against the plaintiff) that he had been there; it goes only to Andersen's credibility.

Andersen was a highly intelligent business man, clean cut, with nothing in his appearance, demeanor, or manner of testifying to cast doubt upon his integrity. The court finds the fact to be that he had not been at Hahatonka nor near it at any time before the trial.

If Andersen had been at Hahatonka before the trial, then he was guilty of contempt as well as perjury for his false swearing on the voir dire examination, but it would by no means follow that the verdict should be set aside absent some showing that that fact and his statement of that fact to the jury and his further statement that in his opinion the property had not been damaged (assuming he made such statements, which he denied) influenced the verdict adversely to defendants. If, because of his own observation, he believed the property had not been damaged, nevertheless he voted damages in the amount of $200,000. If other jurors believed Andersen had seen the property and that he thought it had not been damaged, not one of them said that on that account he lowered his estimate by a single dollar. What the jury did is in keeping with what otherwise should be presumed it would do, what its oath required, what over and over again it was charged it must do, it based its verdict solely on the evidence in the case and the law as the court declared it. Certainly it is not to be presumed that a jury of intelligent men would forget its plain and fully comprehended duty because one of its number said during its deliberations what he should not have said (whether it was true or false). It is not even to be presumed that the one offending juror would so far forget his duty as to permit his personal knowledge, not based on the evidence, to influence his own vote.

Touching juror Andersen, there is one more complaint. The contention is that he did not fully disclose the nature of his business relations on the voir dire examination. He said then he was employed by a corporation whose business was selling stocks and bonds. He was. But he also was then employed by an appraisal company. He did not mention that. There is no showing that that nondisclosure (it was not a nondisclosure resulting from any improper motive)[1] prejudiced defendants. The appraisal company had no connection

---

[1] In this district, pursuant to a rule adopted upon the recommendation of the federal judicial council, the voir dire examination is conducted by the judge.

The jury panel is made up (and that was true in this case) at least ten days before the date of trial. A list of the jurors constituting the panel, showing the address of each juror and showing also his occupation, is made available to the parties long before the date of trial. That was true in this case.

On the voir dire examination the judge asks every question generally of the entire panel in so far as that is possible. Since the very object of the rule is to avoid the great waste of time resulting from an extended examination of each individual juror, it is not the practice here to examine every individual juror separately except when the answer of some individual juror to a general question requires further inquiry of him.

Ordinarily, the judge would not ask an individual juror as to the nature of his business, since the nature of his occupation appears upon the list made up by the clerk, copies of which have been furnished to the parties. No inquiry would have been made of juror Andersen in this case as to his business except for the fact that upon the list which the judge had in his

with plaintiff and had done no work for plaintiff.

Counsel argue that they would have challenged Andersen if they had known he was an expert land and personal property appraiser. They desired no expert and trained appraiser on the jury. (Why not? Because, they say, one trained in valuing such things as ordinary land and chattels would not as fully appreciate the pecuniary value of towering cliffs, rushing waters, and far vistas, all aglow with changing colors and vibrating with nature's harmonies, as would a seller of stocks and bonds.) But the basis for the argument disappears when we consider that Andersen was not himself an appraiser of properties at all. He was a mere solicitor for an appraisal company, one who painted rosy pictures of the value of his employer's services to prospective clients. As Mr. Hyde, solicitor of appraisal contracts, he was as likely to truly value a golden sunset or a poet's dream as when he was Dr. Jekyll, seller of stocks and bonds.

### Other Matters.

2. Upon the oral argument of the motion for new trial, only two other matters (of the twenty grounds enumerated in the motion) were argued. One of these concerned a formal waiver by plaintiff of certain of its rights under its license and the decree of condemnation, especially its rights to cut certain trees and to remove certain dams. But the court's ruling in this connection, of which complaint is made, was in strict compliance with the law of the case as declared by the learned Circuit Court of Appeals. Counsel for defendants believe that that court erred. It is not for this court, however, to correct the errors of that court. Our task is large enough without assuming so great a burden.

The second of the two other matters just mentioned was this: That the court erred in charging that the defendants might remove certain unsightly stumps left by plaintiff about the borders of Hahatonka Lake. The contention is that defendants cannot remove these stumps without the government's consent, to do so might interfere with navigation. The argument is strained. It is scarcely to be believed that a stump in a navigable water is an aid to navigation, much less a stump upon the shore.

Of course, the defendants may remove these stumps and will do so, no doubt, when their ugliness has ceased to be an asset. The stumps belong to the defendants, are their property. They can be removed at trifling cost. The easement acquired by plaintiff was to flood the shores to a line inclosing the stumps in question, it was not an easement to have and use the stumps. The duty of plaintiff under its license from the government was to cut the trees, not to maintain the stumps. Removal of the stumps will conflict neither with plaintiff's easement nor its duty, nor with navigation.

### Questions not Argued.

3. No discussion is set out here of questions raised by the motion but not argued orally. The record will disclose that every contested ruling was accompanied by a statement of reasons for the ruling. Nothing would be accomplished by repetition here.

### In Conclusion.

4. In conclusion, it should be said that in the opinion of the trial judge, from a consideration of all the evidence, the amount of damages found by the jury was most liberal to defendants. A verdict for a smaller amount would have been fully justified and more consistent with the most credible and convincing testimony in the case.

### Order.

The motion for new trial is overruled. It is so ordered. An exception is allowed defendants.

hand it was stated that he was a "salesman," with nothing stated as to the identity of his employer. Therefore, the judge inquired of Andersen, "You are a salesman for what company?"

It is to be noted that no such question was asked of Andersen as that he should state the nature of his business or occupation. His answer to the question which was put to him was entirely truthful. His nondisclosure of any other occupation than that of salesman was in no sense a concealment by him.